# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

ANNA GRACE STUCKEY,

                 Plaintiff,

v.                                          ACTION NO. 2:14cv656

CAROLYN W. COLVIN,
Acting Commissioner of
Social Security,

                 Defendant.

## UNITED STATES MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

Plaintiff, Anna Grace Stuckey ("plaintiff" or "Stuckey"), brought this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Acting Commissioner ("Commissioner") of the Social Security Administration ("SSA") denying Stuckey's claim for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act.

An order of reference dated March 4, 2015, assigned this matter to the undersigned. ECF No. 10. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and (C), Rule 72(b) of the Federal Rules of Civil Procedure, and Local Civil Rule 72, it is hereby recommended that Stuckey's motion for summary judgment (ECF No. 12) be GRANTED, the Commissioner's motion for summary judgment (ECF No. 14) be DENIED, the decision of the Commissioner be VACATED, and the case be REMANDED to the Social Security Administration for further proceedings consistent with this report and recommendation.

# I. <u>PROCEDURAL BACKGROUND</u>

Plaintiff, Anna Grace Stuckey, protectively filed an application for DIB on February 6, 2013, R. 118-20[1], alleging she became disabled on November 28, 2009 due to chronic back and pelvis pain, leg pain, depression, and anxiety.  R. 156.[2]  The Commissioner denied Stuckey's application on December 18, 2013 and, upon reconsideration, on April 3, 2014.  R. 50-60, 62-73. At Stuckey's request, an Administrative Law Judge ("ALJ") heard the matter on July 16, 2014, and at that hearing received testimony from Stuckey (who was represented by counsel) and an impartial vocational expert ("VE") (who appeared by telephone).  R. 35-49.  On August 1, 2014, the ALJ denied plaintiff's claims, finding that Stuckey was not disabled.  R. 15-33.

On October 21, 2014, the Appeals Council denied Stuckey's request for review of the ALJ's decision.  R. 1-6.  Therefore, the ALJ's decision stands as the final decision of the Commissioner for purposes of judicial review.  *See* 42 U.S.C. §§ 405(g), 1383(c)(3); 20 C.F.R. §§ 404.981, 416.1481.  Having exhausted all administrative remedies, Stuckey filed a complaint with this Court on December 31, 2014.  ECF No. 3.  The Commissioner answered on March 3, 2015.  ECF No. 8.  In response to the Court's order, the parties filed motions for summary judgment, with supporting memoranda, on April 6 and May 6, 2015, respectively.  ECF Nos. 12-13, 14-15.  As neither party has indicated special circumstances requiring oral argument, the case is deemed submitted for a decision.

---

[1] Page citations are to the administrative record previously filed by the Commissioner.

[2] Stuckey's application for supplemental security income was denied by the Social Security Administration due to excess income at the time of her application.  R. 122, 140.  Stuckey did not appeal that decision.

## II. <u>RELEVANT FACTUAL BACKGROUND</u>

### A.      *Stuckey's Background*

Anna Grace Stuckey was born in 1989 and was 20 years old on November 28, 2009, the onset date of her alleged disability.  R. 118.  Stuckey completed an associate's degree in culinary arts, and served in the United States military from May 2006 through May 2011.  R. 118, 244.  Stuckey was involved in a motor vehicle accident in November 2009, when she fractured her pelvis, her sacrum, several bones in her left leg, and her ribs.  R. 281, 222-23.  She underwent multiple operations, in-patient rehabilitation, and physical therapy.  R. 218-21, 243.  At the August 1, 2014 hearing before the ALJ, Stuckey reported she was working part-time as a cake decorator, and was training to be a culinary chef.  R. 40-41.  Stuckey described experiencing severe lower back pain, and sharp leg pain where a metal rod was placed between her ankle and knee.  R. 42-43.  She also testified that she suffered from anxiety and depression.  R. 43-44.

### B.      *Relevant Medical Record from November 29, 2009*

On November 29, 2009, the day after her alleged onset date, Stuckey was the restrained driver in a single-car rollover accident[3] and was transported by airlift to the Riverside Regional Medical Center where attending physician John McGee, M.D., noted multiple injuries including a displaced unstable fracture of her pelvis and sacrum, closed fracture of her left tibia and fibula, closed fracture of her left midshaft humerus, closed fracture of her left medial malleolus, fractures of her right first and left first and second ribs, and fractures of right transverse processes L1, L2 and L3.  R. 218, 222-23.  Stuckey underwent surgery that day to stabilize her left tibia, left medial malleolus, and left humerus.  R. 218-21.  Due to the severity of the pelvic

---

[3] The rear seat passenger was killed in the accident, and a front-seat passenger was evaluated in the emergency room and released.  R. 218.

fractures, Stuckey was transferred to the Naval Medical Center in Portsmouth ("NMCP").   R. 220.

Upon admission to NMCP on December 1, 2009, Stuckey was alert and cooperative, and she complained of pain in the pelvis, spine, neck, left arm and left leg.  R. 220, 301-303.  The following procedures were performed at NMCP:  (1) left tibia revision of intramedullary nailing and medial malleolus open reduction internal fixation (December 4, 2009), (2) pelvic ring open reduction internal fixation and external fixator placement (December 4, 2009), (3) inferior vena cava filter placement (as she would require long term nonweightbearing on the bilateral lower extremities) (December 4, 2009), (4) left lower extremity compartment fasciotomies and closure of fasciotomies (December 5 and 8, 2009), (5) irrigation and debridement of left lower extremity skin necrosis and wound vacuum assisted closure placement (December 31, 2009), (6) skin grafting of left lower extremity (January 5, 2010), and (7) open reduction internal fixation of the right Lisfranc (midfoot) injury (January 7, 2010).  R. 243, 268.  Stuckey consulted with a plastic surgeon regarding the management of the skin necrosis and skin grafting to her left lower extremity.  R. 264.

Narrative summary notes dictated by Dr. Catherine M. Rapp with NMCP, on January 19, 2010, indicate Stuckey had significant difficulty gaining adequate pain control, requiring significant doses of narcotics including IV and long acting oral narcotics, which prolonged her hospital course.  R. 265.   However, she eventually began physical therapy for bilateral upper extremity weight-bearing and lower extremity non-weight-bearing, and was able to do transfers on her own.  R. 265.

On January 20, 2010, Stuckey was transferred to the Acute Inpatient Rehabilitation Unit at Sentara Norfolk General Hospital for physical therapy, to be followed by Robert Walker, M.D.

4

R. 241-43.  Dr. Walker assessed Stuckey and noted she was pleasant, her affect was appropriate, and she denied any prior medical conditions including depression.  R. 243, 245.  She reported pain in her left groin and pelvic area due to overexertion, as well as occasional spasms and burning in her left lower extremity.  R. 245.  Stuckey reported that her nausea, vomiting, and constipation had improved with her current medications.  R. 245.

Upon discharge from Sentara Norfolk General Hospital on February 3, 2010, Stuckey was instructed to walk each day (starting with five minutes and increasing to 15-20 minutes per day and resting when tired), as well as to swim, bike, and exercise her arms, feet, and legs while sitting.  R. 228-29.  She was given a phone number to call to assist her with quitting smoking.  R. 229.  Stuckey was instructed not to drive, and to attend physical therapy three times a week for two weeks.  R. 229.  Her prescriptions upon discharge were morphine, oxycodone, Valium, Lyrica, Lovenox, Feosol, and vitamin C.  R. 230-31.  Stuckey's discharge summary indicates she was stable, though not able to bear weight on the left lower extremity; her pain was well modulated with opioids and she was instructed to taper down medication as tolerated; and, her depressed mood had improved.  R. 234-35.

The same day as her discharge, February 3, 2010, Dr. Robert Gaines and Dr. Jonathan Maher performed surgery at the NMCP to remove the external fixator from Stuckey's pelvis.  R. 258.

On April 10, 2010, Stuckey reported to physician assistant ("PA") Cameron Baker with NMCP that she had recently switched from using a wheelchair to using crutches.  R. 289.  At her appointment, Stuckey was in a wheelchair and was wearing ortho boots on both lower extremities.  R. 290.  She was diagnosed with right ankle pain following overuse and weight bearing.  R. 290.

5

During follow up at the NMCP, on April 19, 2010, Stuckey was experiencing pain with ambulation.  R. 297.  She was using a daily bone stimulator on her left leg, and her left thigh had mild swelling. R. 297.  Due to a left tibial non-union, Stuckey agreed to proceed with a nonunion repair surgery, which Dr. Mamczak performed on April 22, 2010.  R. 297, 281-882.  At the same time, painful hardware was removed from her left ankle.  R. 253-56, 281.  Stuckey was placed in a short-leg splint, was instructed not to bear weight on her left lower extremity for two to three months, to continue using a bone stimulator on a daily basis, and to stop smoking.  R. 256.

On August 9, 2010, Stuckey reported to James Ritchie, M.D., at NMCP that she had experienced nausea and vomiting for three to four months that was progressively worsening.  R. 294-95.  Stuckey was given intravenous fluids and Zofran.  R. 295.

On October 1, 2010, Dr. Gaines performed surgery to remove hardware from Stuckey's left humerus, and to perform a left rotator cuff repair.  R. 293.

On November 17, 2010, Stuckey was experiencing "baseline type pain" in her left shoulder and knee, described as 5 out of 10.  R. 262.  Her motor strength was 4/5 in her upper extremities and 5/5 in her lower extremities.  R. 262

On November 18 and 19, 2010, Stuckey attended two group therapy sessions facilitated by two psychiatric technicians with NMCP.  R. 285-87.  Stuckey "actively and appropriately" participated, reporting that her mood was "ok," but that she was "really sore."  R. 285.  She reported that she had been taking Oxycodone for almost one year, and stopped suddenly when she returned to work.  R. 285.  She further indicated that she did not want to take medication for her pain, "because I think that was part of the problem as to why I got here."  R. 287.

On December 2, 2010, Robert J. Gaines, M.D., and Matthew Matiasek, M.D., with the NMCP, performed surgery on Stuckey to remove the humeral nail, and also to repair the rotator

cuff supraspinatus tendon. R. 260-61.

On February 17, 2011, Michael A. Mitchell, PA-C, performed a left heel cord lengthening procedure, and Stuckey was discharged with crutches, a "cam boot," and prescriptions for Percocet for pain and Surfak for constipation. R. 275.

On March 2, 2011, Stuckey reported to Dr. Gaines that she continued to experience moderate pain in her ankle (6 out of 10) that was not decreased by Percocet, and drainage from the ankle incision. R. 279. X-rays of the left ankle revealed the hardware was in place, and fractures were healed. R. 279. In a "Limited Duty Medical Board Report" filled out the same day, Stuckey's treatment plan included physical therapy for left ankle range of motion and strengthening, however, she was to avoid lifting and prolonged standing or walking. R. 278.

On May 17, 2011, Stuckey was released from military service. R. 148-49. Upon release, Stuckey received a 50% service connected disability rating for traumatic arthritis, hiatal hernia, limited flexion of thigh, lower leg condition, tendon inflammation, and lumbosacral or cervical strain, for which she receives $810 per month in VA benefits. R. 122, 314-15, 438.

Stuckey was incarcerated in the Virginia Peninsula Regional Jail, from January 31, 2012 through June 15, 2012, for underage drinking and possession of alcohol in connection with the motor vehicle accident. R. 367, 414-30. In response to booking observation questions, Stuckey indicated she had chronic pain in the leg and pelvic area and had acid reflux disease. R. 428-29. She reported trying to commit suicide seven months prior, and that she was being treated for depression. R. 428. Stuckey was denied tramadol while incarcerated, but was allowed to take other medications prescribed at the VA. R. 420.

On March 13, 2012, Stuckey was seen by the medical department in the jail for dizziness and feeling like she may have a syncopal episode. R. 423. The notes indicated Stuckey reported

mild nausea, leg pain, a temporal headache, and chest pain, and that she exhibited a tearful affect.  R. 423.

On October 22, 2012, Stuckey reported to John S. Williams, supervisory social worker at the Hampton VA, that she was only there because her probation officer wanted her evaluated, and she did not want any mental health treatment "because nothing is wrong with her."  R. 368. She reported she was not taking any medications, and that she was earning $1,600 per month from SJL Modeling Connection.  R. 366

On January 26, 2013, Stuckey was seen by Brian L. Rubenstein, M.D., at the VA medical center emergency room for diarrhea, burning pain in the lower abdomen, and chronic left ankle pain that was not controlled with over the counter medication.  R. 249, 360-61.  The abdominal pain and diarrhea were believed to be from a virus.  R. 363.  She was prescribed Lomotil for diarrhea and Ultram (tramadol) for the ankle pain, and instructed to follow-up with her primary care physician.  R. 249, 363.

On March 7, 2013, Stuckey reported to primary care physician Edwin C. Malixi at the Hampton VA that she was experiencing anxiety, chronic pain (5 out of 10), and GERD.  R. 343. She reported having anxiety since she was thirteen years old, but indicated it had worsened in the last year, causing nausea and vomiting.  R. 343.  She reported chronic pain that was aggravated by standing, sitting, and cold weather, and was relieved by pain medication (tramadol) and rest. R. 343, 348-49.  Stuckey's post traumatic stress disorder ("PTSD") and depression screening were both negative with a score of 0.  R. 352-53.   She indicated that she was taking courses in environmental engineering, and was working part-time as a spokesmodel.  R. 343.  Dr. Malixi diagnosed anxiety, chronic pain, GERD, insomnia, and tobacco use.  R. 345.  Stuckey received tobacco counseling, and was prescribed omeprazole, tramadol, and zolpidem.  R. 345, 347.

On August 7, 2013, Stuckey reported to Dr. Malixi that she was "having nerve pains" in her lower extremities and lower back since her motor vehicle accident, and described the pain as "boring to her bones, sometimes sharp," and a 6-8 out of 10.  R. 323.  She reported that in addition to modeling, she worked part-time baking cakes.  R. 324.  Dr. Malixi diagnosed neuropathy, tobacco use disorder, and chronic pain syndrome.  R. 325.  He continued Stuckey on benzonatate, ketotifen, omeprazole, and tramadol, and added prescriptions for diazepam and gabapentin.  R. 326.

On November 7, 2013, Stuckey reported to Dr. Malixi that she was having neuropathy, insomnia, and chronic pain, which she described as a sharp, burning aching pain, 5 out of 10, that is aggravated with standing or walking for a long period of time and was unchanged since her last appointment.  R. 405, 409-10.  She reported that gabapentin helped a bit with her neuropathy, tramadol offered some relief from the chronic pain, and Ambien helped her to sleep.  R. 405.  She reported that following 2-3 days of work, she had to rest in bed for 2-3 days.  R. 406.  Dr. Malixi diagnosed insomnia, chronic pain syndrome, and tobacco use disorder.  R. 407.

On November 22, 2013, imaging results from Sentara Virginia Beach General Radiology of Stuckey's left tibia fibula and left ankle showed "internal fixation tibia and fibula with very marked periosteal bone formation in the mid and distal tibial shaft," hardware intact, and small proximal fibular exostosis (formation of new bone on the surface of a bone).  R. 369-70.

On January 24, 2014, Stuckey was seen in the Hampton VA emergency room by Ronald C. Landry, M.D., for low back pain, which she described as an aching pain, 8 out of 10, that is aggravated by movement.  R. 392, 397-98.  Stuckey reported that she slipped one week prior and landed on her left knee causing pain in her left knee and ankle, that mild low back pain began the day prior, and that her back was not injured in the fall.  R. 399.  X-rays of her pelvis, knee, and

ankle were unremarkable.  R. 401.  Examination revealed tender left pelvis, left knee, and left ankle with no abrasion or effusion.  R. 401.  Stuckey's strength was 5/5 and symmetric, and her sensation was intact.  R. 401.  Her medications were listed as benzonatate, cyanocobalamin, gabapentin, ketotifen, multivitamin, omeprazole, tramadol, and zolpidem.  R. 394.  Dr. Landry diagnosed acute low back pain, and prescribed Stuckey an anti-inflammatory, meloxicam, and told her to follow-up with her primary care physician.  R. 395-97, 401.

On February 26, 2014, Stuckey reported to Dr. Malixi that she was experiencing a burning sensation in her feet that felt as if her toes were on fire, and gabapentin did not relieve the pain.  R. 381.  She also reported one episode of a rectal bleed, but wanted to defer evaluation for that.  R. 381.  She reported that vitamin B12 helps to energize her.  R. 381.  A PTSD and depression screen were negative, though Stuckey reported smoking tobacco, "having difficulty with food money," and "dating to eat."  R. 383, 391.  Dr. Malixi diagnosed unspecified idiopathic peripheral neuropathy, tobacco use disorder, and rectal bleed, and continued Stuckey on current medications of benzonatate, cyanocobalamin, gabapentin, ketotifen, omeprazole, and tramadol, adding diazepam, meloxicam, and zolpidem.  R. 382, 384.

On March 3, 2014, Stuckey met with orthoptist Roger G. Sealey to be measured for a back brace to help with chronic low back pain.  R. 517.

On April 28, 2014, following a telephone call in which Stuckey reported she was unable to sleep and that she was experiencing anxiety and depression, Dr. Malixi prescribed trazadone to be taken at bedtime.  R. 518.

On May 15, 2014, Stuckey was referred to the primary care mental health team at the Hampton VA for an initial screening, and was contacted by psychology technician Chassity M. Blizzard, M.A., by telephone for an interview.  R. 509-16.  Stuckey reported decreased interest,

10

depressed mood, difficulty sleeping, fatigue, feelings of failure, and lack of concentration.  R. 510.  She reported thoughts of self-harm in 2011 (when she attempted to fall on a knife), and in 2012 (when she overdosed on Ambien), but denied any current thoughts, plans or intent to hurt herself.  R. 510.  She reported that she witnessed her friend's death, and that she re-experiences these events.  R. 510.  Stuckey reported excessive worry, difficulty controlling worry, restlessness, tension, tiredness, and irritability.  R. 513.  Her medications were trazodone (antidepressant), gabapentin (pain), tramadol (pain), and Ambien (sleep).  R. 511.  She reported that her depressive symptoms and anxiety symptoms made it very difficult to do her work, take care of things at home, or get along with others.  R. 512, 514.

On May 18, 2014, Stuckey was seen in the ER due to blackout/multiple seizures, and was discharged home the same day.  R. 505, 508.  It was suspected that the cause was tramadol.  R. 508.

On May 19, 2014, psychologist Sarah J. Ingle, Ph.D., met with Stuckey to identify Stuckey's current mental health needs.  R. 508.  Stuckey reported minimal mental health participation in the past other than being hospitalized in Portsmouth Naval Hospital in 2012 following a suicide event. R. 508.  Dr. Ingle noted that Stuckey was alert, oriented, with fluent, goal-directed speech, congruent affect, and intact insight and judgment, but with a slightly depressed and anxious mood. R. 508.  Dr. Ingle diagnosed major depressive disorder, recurrent, and unspecified anxiety disorder.  R. 507.  Dr. Ingle referred Stuckey to Virginia Beach Community Based Outpatient Clinic for a mental health consult.  R. 508.  There are no documents in the record reflecting this consult or any follow up regarding Stuckey's mental health.

On May 22, 2014, Stuckey was seen in the emergency room at the Hampton VA for abdominal pain (7 out of 10) for the previous three days.  490-504.  She was discharged with prescriptions for Vicodin and Cipro, and instructions to follow up with her primary care physician.  R. 490-501.  On May 28, 2014, Dr. Malixi prescribed Zofran.  R. 485.

On June 10, 2014, Stuckey reported to Dr. Malixi that she continued to experience abdominal pain, and that Vicodin and over the counter colon green helped when taken four times a day.  R. 472.  Stuckey was continuing to take ciprofloxacin (antibiotic), cyanocobalamin, meloxicam, multivitamin, and ondansetron.  R. 472.  Dr. Malixi diagnosed abdominal pain, tobacco use disorder, and insomnia, and prescribed hydrocodone, triamcinolone actinide cream, and zolpidem at bedtime.  R. 472-73.

On June 26, 2014, an EEG was performed due to seizure activity on May 17 and 18, 2014.  R. 462.  No seizures were seen, but epilepsy was not ruled out.  R. 462.  The same day, Stuckey had a gastroenterology consult for abdominal pain and diarrhea.  R. 464.

## C.    *Consultative Examination Report – December 15, 2013*

On December 15, 2013, Shawne Bryant, M.D., performed a consultative examination of Stuckey.  R. 371-73.  Stuckey alleged disability due to chronic back, pelvis, ankle and leg pain, as well as depression and anxiety.  R. 371.  Stuckey reported she could stand for two hours, at which point a burning sensation started in her big toe and radiated into her legs; could walk a mile after which she developed pelvic and back pain; and, could sit for twenty minutes, after which she experienced lower back and pelvic pain.  R. 371.  She stated she could not lift greater than fifteen pounds with her left arm, had difficulty walking up stairs and squatting, and her pain increased when it was cold and rainy.  R. 371.  She reported swelling of her feet and ankles after standing that would subside overnight, heartburn that was relieved by Nexium, and headaches

12

two to three times per week with sharp bilateral temple pain and sensitivity to noise and light.  R. 371.  Her medications were tramadol, Prilosec, ondansetron, zolpidem, diazepam, gabapentin, and benzonatate.  R. 372.

Stuckey reported doing hot yoga for the past three years, and working part time as a model and cake decorator.  R. 371-72.  She stated she could stand two hours at a time, but would be bedridden the next day.  R. 372.  She indicated she could dress and feed herself, drive, sweep, mop, vacuum, cook, do dishes, shop, and go upstairs, but she could not mow grass.  R. 372.

Examination revealed normal ambulation and normal gait, ability to get on and off the examination table and out of a chair without difficulty. R. 372.  Stuckey limped on the left leg when walking on heels, inverted the left foot ten degrees when walking on toes, and inverted the left foot when walking heel to toe, which she was able to do without difficulty.  R. 372.  Her ankle had minimal swelling, and her left leg skin graft was sensitive to the touch.  R. 372.  Her range of motion was somewhat limited, but grip strength was normal, straight leg raises from supine and sitting positions were normal, and muscle strength was 5 out of 5 bilaterally.  R. 372.  Stuckey's affect was appropriate, she had good memory, good cognition, and a good fund of knowledge.  R. 373.  Dr. Bryant noted that she was cooperative and her credibility was good.  R. 373.  Dr. Bryant diagnosed chronic back, pelvis, ankle and leg pain, and a history of depression and anxiety.  R. 373.

### D.     *State Agency Physician Assessments*

On December 16, 2013, state agency physician Bert Spetzler, M.D., reviewed Stuckey's record and made an RFC assessment.  R. 50-60.  After reviewing the record with respect to Stuckey's mental health treatment, Dr. Spetzler determined the evidence showed Stuckey had mild difficulty in maintaining social functioning and in maintaining concentration, persistence or

13

pace, and did not show a severe mental impairment.  R. 54-55.  Based on his evaluation of the

record, Dr. Spetzler's RFC assessment was that Stuckey could occasionally lift and carry 20

pounds and could frequently lift and carry 10 pounds, could stand or walk for 4 hours in an 8

hour day, and could sit with normal breaks for 6 hours in an 8 hour day.  R. 57.  She could

occasionally climb ramps and stairs, balance, stoop, kneel, and crouch, but could never climb

ladders, ropes or scaffolds, or crawl.  R. 57.  Based on the assessment, Dr. Spetzler concluded

Stuckey could not perform her previous light work, but could perform sedentary work.  R. 59.[4]

On April 3, 2014, during the reconsideration of Stuckey's application, state agency

physician R.S. Kadian, M.D., reviewed Stuckey's record and made a RFC assessment.  R. 60-73.

Dr. Kadian considered Stuckey's report that her condition had worsened, and summarized the

medical records added to the record following Dr. Spetzler's review.  R. 67.  Dr. Kadian

concluded based on the medical record that Stuckey's mental health impairments remained

nonsevere, and his RFC assessment was almost identical to Dr. Spetzler's, with the addition of

environmental limitations – that Stuckey should avoid concentrated exposure to extreme cold,

extreme heat, and hazards.  R. 70-71.

### E.    *Statements by Plaintiff and Others Regarding Her Impairments*

On October 29, 2013, Stuckey filled out a function report indicating that she could handle

her personal care, did yoga, meditated, worked 2-5 hours on weekends, and spent time with

friends.  R. 172-73.  With respect to helping others and performing chores, she reported that she

helped bathe her fiance's son, fed him, read him books, prepared her own meals, cleaned the sink

---

[4] Dr. Spetzler indicated a consultative examination was needed to establish the current severity of Stuckey's impairments, but also referred to the results of a consultative examination.  R. 53, 54, 56.  It is unclear whether Dr. Spetzler felt an additional consultative examination was necessary.

and toilet, occasionally took her dogs to the park, did laundry, vacuumed, could drive and shopped once a week from thirty minutes to one hour, while sitting in a handicap grocery cart. R. 173-75, 178.  She reported difficulty sleeping due to severe nerve pain and arthritic pain, and that she was prescribed Ambien to help her sleep.  R. 173.  In response to questions about her physical abilities, she reported she could lift 5 to 15 pounds; she had difficulty squatting, bending and reaching due to the metal hardware; kneeling hurt due to multiple surgeries; and, she had difficulty standing and walking due to severe arthritis, and could walk ½ mile before needing to rest for a few minutes.  R. 177.  With respect to her mental capabilities, she reported her memory and concentration had been affected by her head injuries and turmoil, and she could pay attention for 10 to 20 minutes, but did not finish what she started (such as conversation, chores, reading, watching a movie) and needed to reread instructions multiple times.  R. 177.  She reported her anxiety had worsened, and that she got very anxious when she had to go to work or any scheduled event.  R. 178.  She reported the cold and rain aggravated her arthritis, making it difficult to get out of bed, she had to rest in bed 3 to 4 days a week to recover from working on the weekend, she had to soak in a hot bath daily and take multiple pain medications on a regular basis due to pain, and she required massage therapy on a regular basis to keep mobility, relieve many pressure points and sharp nerve pain, and to regain movement due to scar tissue.  R. 178-79.

Stuckey completed another disability report on March 20, 2014, indicating her arthritis had worsened due to the onset of cold weather, the pain in her ankle had worsened, her migraines had increased to once or twice per week, and she was on bed rest most days due to severe pain and extreme fatigue.  R. 182.  As a result, she reported that her doctor had doubled the dosage of pain medication.  R. 182.   She further reported that she slipped, and felt the screw in her knee

15

and leg tear, and had been in sharp pain for 1 and ½ weeks.  R. 183.

On April 1, 2014, Stuckey completed a function report indicating she went to work two days per week for a few hours, and then rested.  R. 188.  She reported she read books, performed "self physical therapy" and yoga, fed her dogs and let them go outside, wiped down the toilet, did laundry, and loaded the dishwasher.  R. 188-90.  She reported an inability to sleep without Ambien due to pain and anxiety, and that some days she is bedridden.  R. 189-90.  She reported she could walk one block before it was painful, and she would need to rest for 45 minutes to 1 hour after walking thirty minutes.  With respect to her mental health, Stuckey reported she could pay attention for 5 to 10 minutes, she had severe anxiety attacks (sometimes bursting into tears with difficulty breathing), she was prone to depression from worry and helpless feelings, and she was extremely afraid of driving or riding in a car.  R. 193-94.  She reported she wore a back brace 2 to 3 times per week, used a wheel chair for long distances, was not able to get out of bed on cold rainy days, had "severe nerve pain which burn[ed] like someone electrocuting [her] leg," and she needed to rest after simple activities.  R. 194-95.

On April 25, 2014, Stuckey completed another disability report indicating increased pain in her back and knee, increased burning pain in her feet, increased inflammation in her joints, and increased pain when she stands.  R. 198.

On June 24, 2014, Stuckey's employer, Cassie B. Walker, wrote a letter stating that Stuckey's work schedule ranged from 5 to 15 hours per week, she worked 3 to 4 hours per day, and if asked to work a longer shift, she exhibited signs of pain.  R. 210.  Ms. Walker indicated Stuckey was allowed to sit down while working, took breaks whenever she felt it was necessary, and needed assistance carrying heavy cakes or bringing cakes up and down the stairs.  R. 210.

On July 8, 2014, Rob Devinney, Stuckey's caretaker from 2009 through 2013, wrote a

16

letter regarding Stuckey's condition.  R. 213.  Mr. Devinney indicated Stuckey needed much assistance due to her chronic pain.  R. 213.  He stated that when she lived with him, he provided her transportation because driving caused her severe anxiety and pain.  R. 213.  He stated Stuckey became fatigued after small tasks, slept 12 to 15 hours per night and took several naps throughout the day, worked for a few days per week and had to stay in bed afterwards due to severe pain and exhaustion.  R. 213.

With respect to her mental health, Mr. Devinney reported that Stuckey was severely depressed, and that he had to intervene several times when she attempted suicide.  R. 213.  He reported that during cold months, Stuckey stayed in bed bundled up with heating pads, that he brought her meals in bed, and that the inability to leave the house intensified her depression.  R. 213.

**F.    *Testimony before the ALJ***

*(Anna Grace Stuckey)*

At the hearing on August 1, 2014, Stuckey testified that she was working part-time as a cake decorator, her employer allowed her to work when she was feeling well and to sit and rest as much as necessary.  R. 40-41.  Stuckey lived with a roommate in a condo with a staircase.  R. 41.  Stuckey testified that she had severe, sharp lower back pain, that she could only stand for twenty minutes before she needed to sit down and rest, and that she wore a traction belt for twenty minutes at a time to help release tension in her spine.  R. 41-42.

When she stood for long periods or walked, Stuckey described sharp pain in her left leg where metal was placed in her ankle and knee.  R. 42-43.  She also explained that the metal plate in her ankle kept her from moving her ankle from side to side, which made it difficult to walk normally or walk up stairs straight.  R. 43.  She was taken off of her pain medications, tramadol

17

and gabapentin, because they caused her to have black outs, seizures, drastic mood swings, and lack of appetite.  R. 43.  She reported taking Vicodin for pain, and Zofran to help with nausea caused by the Vicodin.  R. 43.

Stuckey testified that she experienced anxiety if she knew she had to be somewhere at a certain time, and that depression made it difficult to be around people or leave her house.  R. 44.  When asked to describe her typical day, Stuckey reported she stayed in bed all day on the days that she did not work, getting up every few minutes to stretch.  R. 44.

*(Vocational Expert – Linda Augens)*

The ALJ asked VE Linda Augens whether jobs exist for a hypothetical person with Stuckey's age, education, and work experience, who was able to lift, carry, push and pull up to ten pounds occasionally from waist to chest level; able to stand and walk for four hours in an eight-hour day and sit for six hours in an eight-hour day, but would need the option to sit or stand every fifteen to thirty minutes; would need to avoid crouching, kneeling, crawling, and climbing ladders, ropes and scaffolds, but could perform other postural movements occasionally; must avoid working around hazards such as moving dangerous machinery and unprotected heights; was limited to simple, routine, repetitive tasks, and must avoid fast paced work such as assembly line jobs involving production quotas; and, was limited to occasional interaction with the public and co-workers.  R. 45-46.  VE Augins testified that such a person was capable of sedentary or light jobs including work as a telephone information clerk, surveillance system monitor, and addressing clerk, which jobs exist in significant numbers in the national economy.  R. 45-46.  When asked whether these jobs would be available to the same hypothetical person, but who could not have frequent interaction with the public in person or over the telephone, VE Augins testified that telephone information clerk would not be available, but such a person could

18

perform work as a laminator, which job exists in significant numbers in the national economy. R. 47.  She further testified that no work would be available for an individual who would require unscheduled breaks, who would be off task more than 15% of the time, or who would miss work three or four times each month.  R. 48.

### III.  THE ALJ's DECISION

To evaluate Stuckey's claim of disability[5], the ALJ followed the sequential five-step analysis set forth in the SSA's regulations for determining whether an individual is disabled.  *See* 20 C.F.R. §§ 404.1520(a) and 416.920(a).  Specifically, the ALJ considered whether Stuckey: (1) was engaged in substantial gainful activity; (2) had a severe impairment; (3) had an impairment that meets or medically equals a condition within the SSA's listing of official impairments; (4) had an impairment that prevents her from performing any past relevant work; and (5) had an impairment that prevents engaging in any substantial gainful employment.  R. 20-29.

The ALJ found that Stuckey met the insured requirements[6] of the Social Security Act through December 31, 2016, and she had not engaged in substantial gainful activity since November 28, 2009, her alleged onset date of disability.  R. 20.  The ALJ indicated Stuckey

---

[5] To qualify for DIB, an individual must meet the insured status requirements of the Social Security Act, be under age sixty-five, file an application, and be under a "disability" as defined in the Act.  "Disability" is defined, for the purpose of obtaining disability benefits, as the inability to do any substantial gainful activity, by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. §§ 423(d)(1)(A), 416(i)(1)(A).  To meet this definition, the claimant must have a "severe impairment" making it impossible to do previous work or any other substantial gainful activity that exists in the national economy.

[6] To qualify for DIB, an individual must also establish disability that commenced on or before the last day in which that individual met the insured status requirements of the Social Security Act.  *See* 42 U.S.C. § 423(a), (c); 20 C.F.R. § 404.131(b).

could not be paid benefits for a closed period, from November 29, 2009 through approximately June 1, 2011, because this closed period is over seventeen months from her protective filing date. R. 24. At steps two and three, the ALJ found that although Stuckey had several severe impairments (anxiety, chronic pain syndrome, residual effects of pelvic and lower extremity fractures and rotator cuff tear, and peripheral neuropathy), these impairments did not singly or in combination meet or medically equal the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, as required for a finding of disability at step three. R. 21-23 (citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526). The ALJ found that Stuckey's remaining impairments were non-severe because they did not exist for a twelve-month continuous period, required no significant medical treatment, or failed to result in any continuous functional limitations, whether exertional or non-exertional. R. 21. The ALJ next found that Stuckey possessed the residual functional capacity to perform less than a full range of sedentary work, as defined in 20 C.F.R. §§ 404.1567(a), with the following exceptions:

> [Stuckey] can stand/walk four hours and sit six hours within an eight-hour workday with a sit/stand option about every 15 to 30 minutes. [Stuckey] has to avoid crouching, kneeling, crawling, and climbing ladders, ropes, and scaffolds, but she can perform other postural movements on an occasional basis. [Stuckey] is limited to simple, routine, repetitive tasks and has to avoid fast pace[d] work such as assembly line jobs involving production quotas. [Stuckey] has to avoid working around hazards such as moving dangerous machinery and unprotected heights as well as extreme temperatures and humidity.

R. 23. At step four of the analysis, the ALJ determined that Stuckey was unable to perform any past relevant work, including work as a culinary specialist. R. 27. Finally, at step five, and after considering Stuckey's age, education, work experience, and RFC, the ALJ found that there are other jobs (such as telephone information clerk, surveillance systems monitor, and addressing

clerk), existing in significant numbers in the national economy, which Stuckey could perform. R. 28.  Accordingly, the ALJ concluded that Stuckey was not under a disability from November 28, 2009 through the date of the ALJ's decision, and was ineligible for a period of disability and DIB.  R. 28-29.

## IV.  <u>STANDARD OF REVIEW</u>

In reviewing a decision of the Commissioner denying benefits, the Court is limited to determining whether the Commissioner's decision was supported by substantial evidence on the record, and whether the proper legal standard was applied in evaluating the evidence.  42 U.S.C. § 405(g); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).  It consists of "more than a mere scintilla" of evidence, but may be somewhat less than a preponderance of evidence.  *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

When reviewing for substantial evidence, the Court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner.  *Craig*, 76 F.3d at 589; *Hays*, 907 F.2d at 1456.  "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)."  *Craig*, 76 F.3d at 589 (quoting *Walker v. Bowen,* 834 F.2d 635, 640 (7th Cir. 1987)).  The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed, unless the decision was reached by means of an improper standard or misapplication of the law.

*Perales*, 402 U.S. at 390; *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987) (citing *Myers v. Califano*, 611 F.2d 980, 982 (4th Cir. 1980)).   Thus, reversing the denial of benefits is appropriate only if either (A) the record is devoid of substantial evidence supporting the ALJ's determination, or (B) the ALJ made an error of law.   *Coffman,* 829 F.2d at 517.

## V. <u>ANALYSIS</u>

### A. *The ALJ's Duty to Develop the Record*

Stuckey alleges the ALJ erred by failing to adequately develop the record when he failed to obtain medical opinion evidence regarding her physical and mental impairments.   Generally, "the ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely only on the evidence submitted by the claimant when that evidence is inadequate."   *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986).   The regulations provide that the ALJ must develop claimant's "complete medical history."   20 C.F.R. § 404.1512(d).   "Where a claimant's medical records are 'inadequate' thereby preventing the ALJ from rendering a disability determination, the ALJ must seek additional records and is obligated to contact claimant's treating physicians 'and seek additional evidence or clarification' therefrom."   *Felton-Miller v. Astrue*, No. 2:10cv5-FL, 2010 WL 4809030, at *12 (4th Cir. Oct. 4, 2010) (citing 20 C.F.R. §§ 404.1512(e)(1), 416.9129e)(1)). That said, "the ALJ is not required to function as the claimant's substitute counsel, but only to develop a reasonably complete record," *Clark v. Shalala*, 28 F.3d 828, 830-31 (8th Cir. 1994), and "the ALJ is entitled to assume that a claimant represented by counsel is making his strongest case for benefits." *Nicholson v. Astrue*, 341 F. App'x 248, 253 (7th Cir. 2009) (citation omitted); *Aytch v. Astrue,* 686 F. Supp. 2d 590, 599 (E.D.N.C.  2010).

To determine "whether an ALJ has fully and fairly developed the record, the proper

inquiry is whether the record contains sufficient evidence" to make a disability determination. *Loving v. Astrue*, No. 3:11cv411-HEH, 2012 WL 4329283, at *5 (E.D. Va. Sept. 20, 2012); *see also* 20 C.F.R. § 404.1512(e). Remand is necessary "[w]here the ALJ fails in his duty to fully inquire into the issues necessary for adequate development of the record, and such failure is prejudicial to the claimant." *Marsh v. Harris*, 632 F.2d 296, 300 (4th Cir. 1980). Prejudice can be established by showing the ALJ's decision "might reasonably have been different had [that] evidence been before [him] when [his] decision was rendered." *Sims v. Harris*, 631 F.2d 26, 28 (4th Cir. 1980) (quoting *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979)).

Stuckey asserts the ALJ had a duty to solicit opinion evidence from her treating physician and request a consultative mental health examination because the limitations caused by Stuckey's impairments were unascertainable without such evidence. Pl. Mem. 13, ECF No. 13.

### 1.    Physical Impairments

The record shows Stuckey suffered extensive injuries as a result of a motor vehicle accident in November 2009, followed by multiple surgeries and physical therapy. R. 243, 268. Approximately one year following her accident, Stuckey was released to limited duty with no lifting or prolonged standing or walking. R. 278. Stuckey had stopped taking her pain medication and her motor strength was good, however, she was experiencing pain in her shoulder and knee, which she described as 5 out of 10. R. 262, 285. Stuckey underwent additional procedures in December 2010 and February 2011 requiring physical therapy, and her limited duty was extended through May 2011, when she was released from military service with a 50% service connected disability rating. R. 148-49, 260-61, 275, 278-79. Stuckey reported chronic pain in 2012, and although she reported she was not taking any medication in October 2012, she was prescribed pain medication for her chronic pain on several occasions from January

2013 through February 2014, as well as medication for insomnia.  R. 249, 326, 347, 382, 423, 428-29.  Additionally, in February 2014, Stuckey was diagnosed with unspecified idiopathic peripheral neuropathy and was prescribed medication for this issue.  R. 382, 384.  While Dr. Malixi was Stuckey's treating physician following her rehabilitation, the record does not contain an opinion from Dr. Malixi regarding the effect her chronic pain, insomnia, and neuropathy had on Stuckey's ability to work.

Following a consultative examination in December 2013, Dr. Bryant noted Stuckey's history, her symptoms, her medications, and her reported functional status.  R. 371-72.  He then performed and noted the results of his examination, which revealed Stuckey could ambulate normally with a normal gait, was able to walk on heels, toes and heel to toe with some limping and some inverting of her left foot, had normal straight leg raising tests, had normal muscle strength, and had appropriate affect, memory and cognition.  R. 372.  Dr. Bryant found Stuckey to be credible, and diagnosed her with chronic back, pelvis, ankle, and leg pain, and a history of depression and anxiety.  R. 372-73.  Dr. Bryant, however, did not complete a residual functional capacity form and gave no opinion regarding the impact of these impairments on Stuckey's ability to do work related functions.   Dr. Spetzler, a state agency physician, reviewed Stuckey's record in December 2013, and noted that there was no medical or other opinion evidence in the record.  R. 56.  Dr. Spetzler's opinion was that Stuckey was capable of sedentary work, able to stand or walk for four hours in an eight-hour day and sit for six.  R. 57.  A second state agency physician, Dr. Kadian, reviewed the record in April 2014, and made the same RFC findings as Dr. Spetzler, except Dr. Kadian added that Stuckey should avoid concentrated exposure to extreme temperatures and hazards.  R. 70-71.

With respect to the effect of Stuckey's physical impairments on her ability to work, the

24

only opinion evidence in the record is the 50% VA disability rating (to the extent this listing of impairments with an indication of the percent of disability assigned to each impairment constitutes an opinion), and the opinions of the two non-examining state agency physicians. The ALJ assigned substantial weight to the VA disability rating, and indicated he incorporated limitations related to the impairments into his RFC finding. R. 27. Presumably, the ALJ incorporated the limitations by finding Stuckey could only "stand/walk four hours and sit six hours within an eight-hour workday with a sit/stand option about every 15 to 30 minutes, "and would need to "avoid crouching, kneeling, crawling, and climbing ladders, ropes, and scaffolds." R. 23. The ALJ further assigned significant weight to the state agency physicians' assessments. R. 27. Stuckey asserts the lack of opinion evidence from Stuckey's treating physician, Dr. Malixi, necessitates a remand for the ALJ to fully develop the record. Pl. Mem. 13-14.

There is no clear standard in the Fourth Circuit for when a record is so deficient that the ALJ is required to supplement the record before rendering a decision. *Lehman v. Astrue*, 931 F. Supp. 2d 682, 692 (D. Md. 2013); *Smith v. Barnhart*, 395 F. Supp. 2d 298, 301 (E.D.N.C. 2005). Where the claimant was not represented by counsel and there were no medical opinions in the record aside from those of the non-treating state agency physicians, one court found the ALJ erred in failing to obtain opinion evidence from the claimant's treating physician and remanded the case for further development of the record. *Smith*, 395 F. Supp. 2d at 307. Smith's treating physician's notes contained informal diagnoses of her impairments, but no opinion as to the severity of plaintiff's impairments or her residual functional capacity. *Id.* at 302. Although the record contained opinion evidence from an examining DDS physician and a non-examining DDS physician, the Court found it would be "illogical" to conclude that the ALJ could circumvent the treating physician rule by neglecting to obtain the opinion of a claimant's treating physician

25

without justification. *Id.* at 302-305. Emphasizing that obtaining medical opinion evidence is a "significant" part of the ALJ's duty to fully develop the record, the court held the ALJ erred by failing to explain to the *pro se* claimant the "advantageousness" of obtaining a medical opinion from a treating physician, and giving the claimant an opportunity to do so. *Id.* at 303, 305. On the basis of proffered medical opinion evidence from Smith's treating physician, the court further found Smith established prejudice and remanded the case. *Id.* at 306.

In an unpublished opinion, however, the Fourth Circuit explained that the *Smith* decision does not necessarily require the ALJ to obtain medical opinion evidence if the administrative record is devoid of such evidence, but rather addresses the duty of care owed to a *pro se* claimant. *Felton-Miller*, 2010 WL 4809030, at *13. The court noted that while "the ALJ is not qualified to assess residual functional capacity based on a bare medical record," the ALJ is not precluded from

> rendering common-sense judgments about functional capacity based on medical findings, as long as the [ALJ] does not overstep the bounds of a lay person's competence and render a medical judgment . . . [I]f the only medical findings in the record *suggested that a claimant exhibited little in the way of physical impairments*, but nowhere in the record did any physician state in functional terms that the claimant had the exertional capacity to meet the requirements of sedentary work, the *ALJ would be permitted to reach that functional conclusion himself.*

*Id.* at *12-13 (citing *Gordils v. Secretary of Health and Human Services*, 921 F.2d 327, 329 (1st Cir. 1990) (emphasis added)). In *Felton-Miller*, the same counsel who represented the claimant at the administrative hearing continued to represent claimant on appeal. *Id.* at *13. The Fourth Circuit held claimant's argument that the ALJ failed to develop the record lacked merit where the record did not "suggest any complex medical problem which was not readily understandable by the ALJ," objective medical evidence supported the ALJ's RFC finding, the ALJ extensively

26

questioned the claimant regarding any medical problem that affected her ability to work, and counsel did not identify any issues needing further development during the administrative hearing. *Id.* at *14-15.

Applying the holdings in *Smith* and *Felton-Miller*, the Eastern District of Virginia has remanded to obtain an opinion from the treating physician where the medical record did not contain such an opinion. *See Loving*, 2012 WL 4329283, at *5-9. In *Loving*, the ALJ erroneously found the claimant had not been referred to a specialist for the treatment of her fibromyalgia and applied an incorrect legal standard to the findings of plaintiff's rheumatologist. *Id.* at *5. Because there was no opinion from the rheumatologist, the ALJ relied heavily on the assessments of the non-treating agency physicians to determine Loving's RFC. *Id.* at *8. Further, the ALJ failed to show substantial evidence in the record to contradict Loving's statements regarding her condition, and those of her family, friends and employer regarding the impact fibromyalgia had on her life. *Id.* at *7. As a result, the case was remanded for the ALJ to clarify the opinions of Loving's rheumatologist, and accord the opinions due deference. *Id.* at *10; *see also Lehman*, 931 F. Supp. 2d at 694 (remanding for the ALJ to obtain a treating physician opinion where the ALJ failed to cite any objective medical findings in support of the RFC, put significant weight on the fact that no opinion from a treating physician indicated the claimant lacked the capacity for sustained work, and assigned significant weight to the state agency physicians' opinions that the claimant was capable of light work based on the ALJ's questionable finding that the claimant was "generally active").

Stuckey argues the record is incomplete without the opinion of her treating physician, Dr. Malixi. The Court does not agree. To the extent Stuckey's counsel determined Dr. Malixi's opinion was necessary to complete the record, counsel possessed the opportunity to present the

opinion, but failed to do so. This conclusion, however, does not relieve the ALJ of his duty to ensure the record is fully developed. *See Loving*, 2012 WL 4329283, at *5-9; *Lehman*, 931 F. Supp. 2d at 694. The Court finds that the ALJ erred in failing to obtain opinion evidence regarding Stuckey's physical impairments, because, under the circumstances of this case, a medical opinion from an examining physician was necessary to determine Stuckey's RFC.

The physical impairments resulting from Stuckey's accident are complex. The complications of her recovery and resulting long-term impairments, including chronic pain, insomnia, and peripheral neuropathy, are not "readily understandable." *See Felton –Miller*, 2010 WL 4809030, at *14. As a result, in determining Stuckey's RFC, the ALJ was not simply "rendering common-sense judgments," but was required to "overstep the bounds of a lay person's competence." *Id.* In support of his RFC, the ALJ noted that none of Stuckey's "treating, examining, or consulting acceptable medical sources has reported findings or opined that [she] is unable to perform work within the established residual functional capacity." R. 24. This is clearly the case where these sources have not provided any opinion regarding Stuckey's RFC.

The objective evidence shows Stuckey's fractures have healed and that her motor strength is good, but also that she has proximal fibular exostosis (formation of new bone on the surface of a bone), a skin graft, and hardware in her left lower extremity. R. 262, 279, 369-70, 372, 395-97. Stuckey also continues to take narcotics for her chronic pain. In addition, the objective evidence does not address the length of time Stuckey is able to walk, stand, or sit. Stuckey's reports of her symptoms consistently indicate that, while she can sit, stand, and walk for short periods, and is able to work park-time, she cannot perform these functions for eight hours or for five consecutive days. Her reports are confirmed by the letters filed by her employer

28

and Mr. Devinney.  Moreover, Dr. Bryant noted Stuckey reported she could stand for two hours, walk a mile, and sit for twenty minutes, but that she would be bedridden the next day, and he found Stuckey to be credible.  R. 371-73.  Because Stuckey's impairments are complex, the consultative examiner found her to be credible, and the record does not contain an opinion from the consulting or treating physician regarding Stuckey's RFC, a remand is necessary to fully develop the record.  Accordingly, on remand, the ALJ shall obtain, at a minimum, the opinion of a consultative examiner.

### 2.    Mental Impairments

Stuckey next asserts the ALJ erred by failing to obtain opinion evidence from her treating physician or a consultative examiner regarding the effect her mental impairments had on her RFC.  Pl. Mem. 14.  Plaintiff relies on the decision in *Kersey v. Astrue*, 614 F. Supp. 2d 679 (W.D. Va. 2009).  Kersey testified that in addition to back pain, she experienced panic attacks once or twice a week, she avoided driving due to the panic attacks, and the attacks caused stomach sickness and increased her heart rate and blood pressure.  *Id.* at 682-83.  Kersey further testified that she had Tourette's syndrome that caused facial twitching, nervousness, and shaking. *Id.*  Kersey discontinued taking medications prescribed for her panic attacks because they did not help and caused adverse side effects.  *Id.* at 685-86, 94.  The ALJ found Kersey's panic disorder to be nonsevere, noting she had no hospitalizations for treatment, no history of treatment from a mental health professional, no significant limitation to her activities of daily living, and the recent medical record contained rare complaints of symptoms related to the disorder.  *Id.* at 694. The court held that where Kersey alleged disability due to nervousness, panic attacks, inability to concentrate and forgetfulness, and the record contained no opinion evidence regarding her mental impairments and limitations, the ALJ should have ordered a consultative mental

examination.  *Id.* at 694-95.  The Court further held that where there was no medical opinion assessing Kersey's mental impairments, "the ALJ erred by substituting his opinion for that of a trained mental health professional."  *Id.* at 695.

Stuckey's medical record contains sporadic references to her anxiety and depression, and no ongoing treatment for mental health issues.  Following her acute inpatient rehabilitation, Stuckey's February 2010 discharge notes indicated her depressed mood had improved.  R. 234-35.  Almost two years later in January 2012, in response to booking observation questions at Virginia Peninsula Regional Jail, Stuckey indicated she had tried to commit suicide seven months earlier.  R. 428.  Over one year later, in March 2013, Stuckey reported to a nurse practitioner at the NMCP that she had experienced anxiety since she was thirteen years old that had worsened in the last year causing nausea and vomiting.  R. 343.  The same day, depression and PTSD screening were negative.  R. 352-53.  Seven months later, in an October 2013 function report, Stuckey reported that her anxiety had worsened, and that she was very anxious when she had to go to work or any scheduled event.  R. 178.

In April 2014, Dr. Malixi prescribed trazadone to be taken at bedtime after Stuckey reported that she was unable to sleep due to anxiety and depression.  R. 518.   During a VA telephone interview on May 15, 2014, Stuckey reported decreased interest, depressed mood, difficulty sleeping, fatigue, feelings of failure, lack of concentration, excessive worry, restlessness, tension, tiredness, and irritability.   R. 509, 513.  Stuckey reported that during the military she had witnessed her friend's death, and that she re-experienced those events.  R. 510.  She further stated that she attempted to fall on a knife in 2011, and overdosed on Ambien in 2012, and that depressive and anxiety symptoms made it difficult to work, take care of things at home, or get along with others.  R. 510-12.  Following a consult on May 19, 2014, Dr. Ingle, a

psychologist, diagnosed Stuckey with major depressive disorder, recurrent, and unspecified anxiety disorder. R. 507-508. Although Dr. Ingle referred Stuckey for a further mental health consult, there are no documents in the record reflecting the consult or treatment for mental health issues. R. 508.

In a letter discussing Stuckey's impairments, Mr. Devinney wrote in July 2014 that Stuckey was severely depressed and that he had to intervene several times when she attempted suicide. R. 213. At her hearing in August 2014, Stuckey testified that she experienced anxiety if she knew she had to be somewhere at a certain time, and that depression made it difficult to be around people or leave her home. R. 44.

At step two, the ALJ found that Stuckey's anxiety was a severe impairment, but that her depression was not severe. "An impairment can be considered as 'not severe' only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." *Evans v. Heckler*, 734 F.2d 1012, 1014 (4th Cir. 1984) (citations and emphasis omitted).

The ALJ then addressed Stuckey's mental impairments at step 3 of the sequential analysis, finding that her impairments did not meet or equal a listed impairment. R. 21-23. The ALJ concluded that Stuckey's mental impairments caused mild restrictions in her activities of daily living, and discussed that, from a mental perspective, Stuckey was fairly independent in personal care, meal preparation, household maintenance, shopping, leisure activities, and ordinary daily tasks. R. 22. Finding Stuckey's mental impairments caused mild difficulties in Stuckey's social functioning, the ALJ stated that while Stuckey had some anxiety in stressful situations, she was adequately able to interact with medical professionals, peers, family

31

members, the general public, and authority figures.  R. 22. The ALJ did find Stuckey had moderate difficulties with regard to concentration, persistence or pace, based on Stuckey's representation that she had difficulty remembering, concentrating, and completing tasks.  R. 22. The ALJ noted that Stuckey remained capable of understanding, remembering, and carrying out simple directions and simple tasks as she continued to work part-time and continued to perform a wide range of daily activities.  R. 22.   Lastly, the ALJ found Stuckey had not experienced any episodes of decompensation of extended duration.  R. 22.

At step four, when determining Stuckey's RFC, the ALJ addressed Stuckey's May 2014 mental health consultation for anxiety disorder and depressive disorder.  R. 26.  The ALJ noted that Stuckey reported she "re-experiences events and has disturbing memories from traumatic experiences, in addition to constant worrying, fatigue, depressed moods, and lack of concentration," making it difficult for her to "work, take care of things at home, and get along with others."  R. 26.  He further noted that Stuckey had been prescribed Ambien and trazadone, but failed to follow up with mental health appointments after May 2014.  R. 26.

Aside from summarizing Stuckey's medical records, the ALJ did not specifically address Stuckey's mental impairments when arriving at his RFC determination, which he determined without the benefit of an RFC assessment from either an examining or non-examining mental health professional.  The RFC does provide that Stuckey is "limited to simple, routine, repetitive tasks, and has to avoid fast pace work such as assembly line jobs involving production quotas." R. 23.  In crafting his hypothetical for the VE, the ALJ further limited the hypothetical person to occasional interaction with the public and co-workers.  R. 45-46.  The ALJ, however, made no attempt to explain how these limitations addressed Stuckey's mental health issues.

Due to the unique circumstances present in this case, where Stuckey witnessed a

traumatic event, reportedly has attempted suicide more than once, has anxiety resulting in nausea and vomiting, has insomnia, has been diagnosed by a mental health professional with major depressive disorder, recurrent, and unspecified anxiety disorder, and the record was not reviewed by a state agency mental health professional,[7] the ALJ was not qualified to determine the effect Stuckey's mental impairments had on her RFC. As a result, the Court finds "the ALJ erred by substituting his opinion for that of a trained mental health professional," *Kersey*, 614 F. Supp. 2d at 695, and recommends that the case be remanded to obtain an opinion from a treating mental health professional or a consultative mental health professional regarding the effect of Stuckey's mental impairments on her ability to work.

## B.    *Function-By-Function Analysis*

Stuckey asserts the ALJ's lack of analysis in determining Stuckey's RFC prevents meaningful review, in particular, the ALJ does not rely upon medical opinion evidence other than assigning significant weight to the assessment of the state agency physician without referencing the exhibit or identifying the consultant by name. Pl. Mem. 15. Respondent asserts the ALJ's RFC finding was amply supported by the evidence discussed by the ALJ in the decision, and asserts the ALJ's failure to identify the state agency physicians or reference the exhibits containing their opinions was an oversight and harmless error. Def. Mem. 15-16. The Court agrees with the respondent on the latter point. The ALJ assigned significant weight to "the State agency medical consultants' assessment that [Stuckey] can do sedentary exertional level work." R. 27. There were only two state agency assessments in the record, and their findings were virtually identical. The ALJ referenced the consultants in the plural, and clearly relied on

---

[7] The state agency physicians, Bert Spetzler, M.D., and R.S. Kadian, M.D., both found Stuckey's mental impairments to be nonsevere, but neither completed a mental health technique form and neither is a mental health professional.

both assessments in reaching his RFC determination.  The ALJ's failure to identify the consultants by name or reference the exhibit where their opinions are located is harmless error. Further, Stuckey's arguments regarding the lack of medical opinion evidence has been addressed in the previous sections.

**C.      *Stuckey's Credibility***

Stuckey next asserts that the ALJ failed to articulate adequate reasons for discounting Stuckey's credibility by incorrectly measuring her credibility against the ALJ's RFC.  Pl. Mem. 16-17.  The ALJ found that Stuckey's impairments could reasonably be expected to cause her symptoms, but that Stuckey's "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely credible for the reasons explained in this decision." R. 24.

When making a credibility determination, the ALJ should engage in the two-step inquiry detailed in 20 C.F.R. § 404.1529 by evaluating:   (1) whether an underlying medically determinable impairment was shown that could reasonably be expected to produce the claimant's symptoms, and (2) if so, the extent to which such symptoms limited the claimant's functioning and ability to work, based upon their intensity, persistence, and limiting effects.  *See Craig*, 76 F.3d at 594-95.

Stuckey attacks the ALJ's credibility determination by suggesting that the ALJ committed an analytical error of the type identified by the Fourth Circuit in *Mascio v. Colvin*, 780 F.3d 632 (4th Cir. 2015).  In *Mascio*, the Fourth Circuit criticized an ALJ's use of "boilerplate language" indicating that a claimant's statements are not credible "to the extent that they are inconsistent with the [RFC]" because such language implied that an ALJ determined a claimant's ability to work first and then used that to assess a claimant's credibility.  *Mascio*, 780

34

F.3d at 639 (noting "this boilerplate 'gets things backwards' by implying 'that ability to work is determined first and is then used to determine the claimant's credibility'") (citation omitted). Here, however, the ALJ did not use the objectionable boilerplate language criticized by the Fourth Circuit.  R. 24 (noting Stuckey's symptoms were not "entirely credible for the reasons explained in this decision").  Accordingly, Stuckey's argument lacks merit.  However, the Court recommends that, on remand, the ALJ address the factors enumerated in 20 C.F.R. § 404.1529(c).[8]

### D.    *Hypothetical Posed to the Vocational Expert*

With respect to the ALJ's analysis at step five, Stuckey claims that the ALJ's alleged errors in determining Stuckey's RFC and assessing her credibility resulted in an incomplete hypothetical to the VE that failed to fully account for her impairments.  Accordingly, Stuckey argues that the VE's testimony about jobs that Stuckey could perform, and the ALJ's resulting finding of no disability, were erroneous.  *See Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989) (a "relevant or helpful" opinion from a vocational expert "must be based upon a consideration of all other evidence in the record . . . and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments") (citations omitted).

To aid the ALJ in reaching a decision, the hypotheticals posed to a VE must account for

---

[8] 20 C.F.R. § 404.1529(c) enumerates factors the ALJ will consider when evaluating symptoms such as pain:  "(i) Your daily activities; (ii) The location, duration, frequency, and intensity of your pain or other symptoms; (iii) Precipitating and aggravating factors; (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms; (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms; (vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms."

all of the claimant's limitations as dictated by the record.  *Walker*, 889 F.2d at 50-51.  If limitations are omitted from the hypothetical, the VE's testimony is of limited value, and may not constitute substantial evidence.  *Johnson*, 434 F.3d at 659 (citing *Walker*, 889 F.2d at 50).

On remand, after sufficiently developing the record with respect to the effect Stuckey's physical and mental health impairments have on her ability to work, appropriately assigning weight to the opinions in the record, and specifically explaining his credibility determination, the ALJ's opinion should consider the VE's testimony in light of all of Stuckey's impairments or explain why the impairments omitted are not supported by the record.

## VI.  RECOMMENDATION

For the foregoing reasons, this Court recommends that plaintiff's motion for summary judgment (ECF No. 12) be GRANTED, the Commissioner's motion for summary judgment (ECF No. 14) be DENIED, the decision of the Commissioner be VACATED, and the case be REMANDED to the Social Security Administration for further proceedings consistent with this Report and Recommendation.

## VII.  REVIEW PROCEDURE

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. §  636(b)(1)(c):

1.  Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this report to the objecting party, see 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure, plus three (3) days permitted by Rule 6(d) of said rules.  A party may respond to another party's objection within fourteen (14) days after being served with a copy thereof.

2.  A district judge shall make a *de novo* determination of those portions of this Report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this court based on such findings and recommendations.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).


/s/
_____
Robert J. Krask
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
January 11, 2016